## Bednar v. Butler Area School District

*Ronald N. Watzman*, for petitioners.
*Charles E. Dillon* and *Thomas W. King, III,* for respondent.

KIESTER, *P.J.,* February 27, 1979—Petitioners were employes of the Butler Area School District prior to their suspensions on June 29, 1976. In all, 60 teachers were suspended. The school district refused the requests for a hearing made by several of the suspended teachers. In a mandamus action this court on February 3, 1977 ordered the school district to conduct hearings in accordance with the provisions of the Local Agency Law of December 2, 1968, P.L. 1133, 53 P.S. §11301 et seq. (A.D. #76-943, Court of Common Pleas of Butler County). The board held seven hearings commencing April 12, 1977 and ending August 30, 1977. It made findings

of fact and conclusions of law and on December 5, 1977 found that the suspensions were proper and in accordance with the law. The case is now before the court on an appeal by petitioners from the school board's final adjudication. The appeal is under the Local Agency Law, 53 P.S. §11307. Inter alia, petitioners say that the findings of fact are not supported by the evidence and were arrived at in an arbitrary and capricious fashion. Petitioners maintain that the board violated the law and abused its discretion in suspending the teachers.

A hearing on the appeal was originally scheduled before the Honorable John A. Cherry on April 25, 1978 but was continued when the State Court Administrator informed this court that there were no funds available to assign a visiting judge to hear this and numerous other cases. The case was rescheduled and heard by this judge on August 22, 1978. The court has before it a complete transcript of the proceedings before the school board, including seven volumes of notes of testimony and exhibits, together with the legal briefs filed by the parties.

## THE LAW AND DISCUSSION

### Scope of Review

The Local Agency Law, 53 P.S. §11308(b), provides that where there is a complete record as here, the court shall hear the appeal without a jury on the record certified by the local agency:

"After hearing, the court shall affirm the adjudication unless it shall find that the same is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of this act have been violated in the proceeding

before the agency, or that any finding of fact made by the local agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may set it aside or modify it, in whole, or in part, or may remand the proceeding to the local agency for further disposition in accordance with the order of the court."

## Causes for Suspension

The Public School Code of March 10, 1949, P.L. 30, as amended, 24 P.S. §11-1124, provides that:

"Any board of school directors may suspend the necessary number of professional employes, for any of the causes hereinafter enumerated:

"(1) Substantial decrease in pupil enrollment in the school district; (2) Curtailment or alteration of the educational program on recommendation of the superintendent, concurred in by the board of school directors, approved by the Department of Public Instruction, as a result of substantial decline in class or course enrollments or to conform with standards of organization or educational activities required by law or recommended by the Department of Public Instruction; (3) Consolidation of schools, whether within a single district, through a merger of districts, or as a result of joint board agreements, when such consolidation makes it unnecessary to retain the full staff of professional employes."

## Suspensions Based on Economic Constraints

Petitioners maintain that the decision to suspend teachers was economic and not based on the causes

set forth in section 1124. It is argued that the number of teachers to be suspended was determined by fiscal constraints. In support of this position reference is made to the testimony of Dr. Bourandas and to the fact that suspensions may have been tentatively approved before the board was furnished with student enrollment data.

On the other hand, the school board states that the suspensions were based on a substantial decrease in pupil enrollment, the curtailment and alteration of educational programs, the consolidation of schools by which 11 classrooms were closed, and the economic impairment of the district due to overstaffing. All of this is supported by substantial evidence. But which came first—the decision to economize, or the evidence to support the decision? Is it essential to determine which came first?

There is neither statutory nor case law that forbids finances and economy by a school board to be a motivating and controlling factor in reducing the number of professional employes. Nevertheless, no matter how much the school board may desire to economize through suspensions it cannot so act in the absence of the causes set forth in section 1124.

In the opinion of this court it makes no difference that economy may have been the initial consideration of the school board in effecting the suspensions. The legislature has granted the school board limited discretion in the operation of a school system. As long as a school board operates the system within the limitations provided by law, the school board does not abuse its discretion.

Without supportive facts the school board could not legally reduce the professional staff. What were the facts on June 29, 1976 when the suspensions were announced? From 1970-71 to 1975-76 there

had been a decline of 813 students and an increase of 50 teachers during the same period. For succeeding years there was a projected decline in enrollment of 300 students annually. Several school buildings had been closed with a net loss of 16 classrooms.

The substantial decline in pupil enrollment constituted legal cause for suspension of professional employes under the school code.

The fact that the school board had increased millage in 1975-76 by seven mills and was confronted with an increase of 15 to 25 mills in 1976-77, if it failed to economize, and that this situation forced school board action, does not make the suspensions unlawful.

### Pupil-Teacher Ratio

Petitioners maintain that with the suspensions there was a substantial increase in the pupil-teacher ratio. This is denied by the board. Petitioners say that in 1976-77 there were two additional pupils per teacher over the prior school year. Upon comparison with earlier years with a higher enrollment and fewer teachers the differential is much less.

The class size and the instructional periods after the suspensions conformed to the standards mandated by the Department of Education. Neither the school code nor case law denies a school board the discretionary power to retrench within the law when faced with rising costs and higher tax levies. No precedent holds that a school board abuses its discretion when fewer teachers result in an increase in the pupil-teacher ratios.

## Realignment of Teachers

Having determined that the school board under the facts was authorized by law to suspend 60 teachers, did the board comply with the law in making the suspensions. The Public School Code, 24 P.S. §11-1125, provides in part that the suspension of school teachers shall be made as follows: "(b) In cases in which suspensions are to be made, professional employes shall be retained on the basis of seniority rights, acquired within the school district of current employment, where no differences in rating are found. Seniority rights shall also prevail where there is no substantial difference in rating. . . ."

Paragraph (a) states, inter alia, that suspensions shall be determined on the basis of efficiency rank—ratings made in accordance with standards and regulations with rating cards prepared by the department.

Although a "numerical" rating system is mandated by the school code, the Butler Area School District maintained no authorized "numerical" rating system. The principal area of agreement between the parties was that each suspended teacher had to be classified as satisfactory and that teachers had to be retained on the basis of seniority rights.

In realigning the teaching staff 148 teaching positions out of 575 teachers were affected by suspensions, transfers and "bumping." *Elementary teachers were not transferred and bumped.* It was decided not to move secondary teachers into the elementary grades, other than health and physical education, art and music. In the senior high school

23 percent, junior high school 34 percent, and in the intermediate high school 43 percent of the teaching assignments were changed. The formula employed in determining the suspensions was as follows:

1. The subject areas were selected.

2. Teachers with the least experience in the subject area and with only 1 subject certification were first listed for suspension.

3. Those teachers with the least experience in the particular subject area but with an additional subject certification then "bumped" the teacher with lower seniority of service in the second area of certification.

It is the position of petitioners that the school board had a duty to realign its entire teaching staff considering certification so as to retain all teachers with the greatest seniority. Petitioners maintain that the school board's scheme of realignment was improper and not in accordance with the law.

A leading case cited by petitioners sets forth the basic rule:

"Where a reduction in teaching staff of a public school is called for, the school board is required, wherever practicable, to retain those teachers with the longest years of service by realigning the staff so that the remaining teachers, after the reduction has been effected, can teach the subjects of those who, because of lesser seniority rights, have been suspended." Welsko v. Foster Township School District, 383 Pa. 390, 393, 119 A. 2d 43 (1956).

Petitioners also maintain that the seniority law was not observed because the realignment of teaching positions was not extended to the elementary level. For example, the board did not transfer an

elementary teacher certified to teach high school subjects to open a position for a high school teacher also certified as an elementary teacher. Nor did a high school teacher certified in an elementary subject bump the elementary teacher with less seniority, although there were transfers in this area.

Both transfers and bumping procedures required by Welkso were applied by the Butler Board to the upper grades. A later Commonwealth Court decision involving both efficiency ratings and seniority approved a realignment plan department by department and determined that a comparison of all professional employes on the basis of efficiency ratings would be unnecessary. What was practical controlled: Trassler v. Upper Dublin School District, 30 Pa. Commonwealth Ct. 171, 373 A. 2d 755, 760 (1977). See also Phillippi v. School District of Springfield Township, 28 Pa. Commonwealth Ct. 185, 367 A. 2d 1133, 1142 (1977).

A further example of petitioner's theory of proper application of the seniority rule would be the transfer of a French/German teacher with 21 years of experience into elementary where she had no experience. This particular teacher had received local, state and national recognition as a foreign language teacher. Such a transfer would have opened a position for a suspended teacher of Spanish with three years' experience.

Another illustration of the transfers and bumping that would have been required to retain one suspended teacher under petitioner's theory of seniority rights is the following:

"Q. Number 26 involves Mr. McClymonds teaching Spanish but also certified in math; Mr. Lowman, L-O-W-M-A-N, teaching math, also certified in reading—in biology, I'm sorry; Mr. Reed or Mrs.

Reed, Miss Reed teaching biology, also certified in guidance; Teacher Kraft teaching guidance but certified in social studies, Teacher Logan teaching social studies but certified in English; Teacher Yovanovich certified in English teaching English and also certified in reading; Teacher McDivitt (phonetic) teaching reading but also certified in elementary. That realignment would involve McClymonds going from Spanish to math in place of Lowman; Lowman going to biology in place of Reed; Reed going to guidance in place of Kraft; Kraft going to social studies in place of Logan; Logan going to English in place of Yovanovich; Yovanovich going to reading in place of McDivitt and McDivitt going to elementary in the place of a temporary professional. Have you checked the certification of those people?

A. Yes, and they are certified as you indicated.

Q. So, those realignments could be made. Is that correct?

A. Mechanically, they can be made, with the reservations I continually express, of course."

The school board excluded its "Alternative Education" program from the plan for suspensions although one suspended teacher was recalled and assigned to this program. "Alternative Education" is a special Butler program for "borderline incorrigibles." It treats some of the difficult and troubled children who have failed in the regular classroom. The teacher who had been recruited for this program lacked seniority. He had been selected for the program not because of his certifications but rather because of his qualifications. Dr. Bourandas described this teacher ". . . as an outstanding leader in the area of discipline, in the area of values, ethics, and a specialist in the area of outward

bound. . . . His whole concept of human awareness is leaps and bounds beyond our other staff's awareness." There was no offer by petitioners to prove that suspended teachers were equally well qualified to teach in "Alternative Education."

What is clear is that the application of the seniority rule and the alignment of teachers as contemplated by petitioners would have seriously disrupted the educational system. There would have been a nearly total disregard of what was best for the children in order to save jobs for teachers suspended under the seniority plan adopted by the school board. As stated by Dr. Bourandas, the realignment of the staff as proposed by petitioners was impractical. Considering the 1000 and more possible changes that might have been required to save petitioners' jobs, the adopted plan with 148 changes was reasonable. The plan and its execution were neither arbitrary nor capricious. There is no evidence in this record of a violation of the seniority rights of petitioners either in the school board's realignment plan or its application.

## Reemployment of Suspended Teachers

On June 29, 1976 there were 60 teachers suspended. For the fall term of 1976-77 the school board hired 53 temporary professional and substitute employes. One of the suspended teachers with special qualifications was reemployed as a substitute and later as a temporary professional employe in "Alternative Education." None of the other suspended teachers were certified to teach in the areas for which the temporary professional and substitute employes were hired. However, nine of the suspended tenured teachers were on sub-contracts for

the 1976-77 school year. Counsel for petitioners maintained that transfers and bumping procedures should have been followed to provide openings for the suspended teachers. Counsel for the school board argued that priority in rehiring is not an issue in this case. The conclusion of this court is that the right of a suspended professional employe to reinstatement is applicable only as a vacancy occurs in that teacher's area of certification.

There is no duty on the school board to transfer and bump employes in order to accomplish a reinstatement when a vacancy develops. The school code does not require such action. Neither is it prohibited. The transferring and bumping of teachers to effect the reinstatement of a tenured employe is discretionary with the school board.

## Determination of Seniority

The school board computed seniority rights of temporary professional employes from the date of employment. The law requires that seniority be measured from the date of certification: Marco v. Montgomery County Intermediate Unit No. 23, 35 Pa. Commonwealth Ct. 517, 387 A. 2d 164 (1978). Whether the temporary professional employes were certified or not certified was not developed by either party. If a temporary professional employe was not certified the evidence was available to petitioners and should have been introduced. Apparently petitioners did not consider such evidence to be material to their case.

The school board erred by including non-teaching service in measuring seniority. There is no evidence that a petitioner was harmed by this mistake.

## Curtailment of Programs

Petitioners maintain that the school board failed to obtain approval for the curtailment of programs, that the programs were curtailed for economic reasons, and that the only basis for curtailment of a program is a decline in course enrollment.

The record establishes that the school board made application and that the Pennsylvania Department of Education responded to the effect that it had no objection to the planned curtailment of programs.* The reason was that the school district continued to meet curriculum requirements and that mandated programs would still be offered.

Petitioners did not support their position with case authority other than their interpretation of section 1124(2) of the Public School Code. This court determines that the school board complied with legal requirements in curtailing the various programs.

## Effect of Delayed Hearing on Suspensions

The position of petitioners is that even if the suspensions were valid, the denial of a hearing as originally demanded entitles petitioners to back pay from the date of suspension to the date of adjudication by the school board. The case upon which petitioners rely is not in point. In that case the temporary professional employe was dismissed for cause—an unsatisfactory rating. The dismissal was considered to be an adjudication, reached without affording her a hearing. The employe remained a temporary professional employe: McKel-

---

*[Compare McManus v. Brownsville Area School District, 14 D. & C. 3d 694 (1980).—Ed.]

vey v. Colonial School District, 22 Pa. Commonwealth Ct. 207, 348 A. 2d 445 (1975).

Suspensions due to policy decisions are in a different category from dismissals for cause. Recent decisions make it clear that suspension of a professional or a temporary professional employe due to reduced enrollment entitles the suspended employe to a hearing. Under the Local Agency Law the court will order a hearing, not reinstatement: DiCello v. Board of Directors of Riverside School District, 33 Pa. Commonwealth Ct. 39, 380 A. 2d 944 (1977); Kodish v. Spring-Ford Area School District, 29 Pa. Commonwealth Ct. 643, 373 A. 2d 124 (1977); Berger v. School District of City of Erie, 29 Pa. Commonwealth Ct. 313, 370 A. 2d 1244 (1977); Fatscher v. Springfield Board of School Directors, 28 Pa. Commonwealth Ct. 170, 367 A. 2d 1130 (1977).

If, after hearing, it is determined that the suspensions were based on any of the reasons enumerated in the Public School Code, reinstatement will not be ordered. In this case since the suspensions were lawful, the teachers are not entitled to compensation.

## Conclusions

The court finds that the findings and conclusions of the school board are supported by substantial evidence. There was no error of law prejudicial to the rights of petitioners. Petitioners failed to establish that the school board abused its discretion and acted arbitrarily in adopting a plan and proceeding thereunder with the suspensions. Quite to the contrary, the school board complied with the provisions of the Public School Code as interpreted by the decisions of the appellate courts.

## ORDER

Now, February 27, 1979, the adjudication of the Butler Area School District is affirmed.